UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GINNIE MCKNIGHT, individually and on behalf of all similarly situated individuals,

　　　　　Plaintiffs,

　　v.

UNITED AIRLINES, INC., et al.,

　　　　　Defendants.

No. 23 CV 16118

Judge Georgia N. Alexakis

MEMORANDUM OPINION AND ORDER

Before the Court are two motions: United's motion to exclude the testimony of plaintiff Jacqueline Garrison's expert, J. Richard Ludgin, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), [99], and Garrison's motion to certify a putative class [83], [84]. For the reasons stated below, the Court grants United's motion to exclude Ludgin's opinions and denies Garrison's class certification motion.

## I. Background

### A. The Consent Form

Garrison, the only named plaintiff remaining in this matter, [98], applied for a job as a United Airlines ramp service employee. [100-4] at 73. As part of the application process, Garrison, like all ramp service applicants, had to perform a physical capability assessment ("physical test"). *Id.* at 90–91. This physical test, administered by technicians employed by third party Datafit, uses special equipment

to measure the applicant's strength. [83-4] at 10, 17. Like all applicants, Garrison had to fill out several forms, also provided by Datafit, before taking the physical test. [83-7] at 68. Among these forms was the Consent & Authorization Form ("consent form"). The consent form included the following language:

> I understand that I must notify the technician administering the assessment if I have any ailments that may impede my performance of the assessment.

[101] at 1. The bottom of the form required the applicant's signature and the date but left no other space for written responses. *Id.*

Garrison argues that this sentence solicits family medical history in violation of the Illinois Genetic Information Privacy Act ("GIPA"), 410 ILCS 513/25(c)(1). [84] at 1. GIPA "regulates the use of genetic testing information in both the medical and commercial settings." *Bridges v. Blackstone, Inc.*, 66 F.4th 687, 688 (7th Cir. 2023). Garrison contends that, by asking applicants to agree to this statement, United violated § 25(c)(1) of GIPA, which provides that an employer "shall not directly or indirectly ... solicit, request, [or] require ... genetic information of a person or a family member of the person ... as a condition of employment [or] preemployment application." 410 ILCS 513/25(c)(1).

Garrison moves to certify a nationwide class and an Illinois-specific subclass of United ramp worker applicants who reviewed and signed the consent form between October 2018 and October 2023. [84] at 7–8. Garrison asks the Court to appoint her as class and subclass representative. *Id.* at 3.

### B. Garrison's Deposition Testimony

During her deposition, Garrison testified that she applied for a ramp service job with United and that, on the appointed day, she reported to a testing center to fill out paperwork and to take, among other exams, the physical test. [100-4] at 86–87, 104. When Garrison arrived at the testing center, a family member called to tell her that her brother had died of heart failure. *Id.* at 20–22, 34. Understandably, the news rendered Garrison "very broken up emotionally" and concerned about completing the physical test. *Id.* at 112, 120. She found herself unenthused and "not probably maybe looking like [she] was ready to perform." *Id.* at 112.

Still, Garrison proceeded to complete the pre-test paperwork and undergo a pre-physical-test interview. *Id.* at 22, 109–11. She also signed the consent form. *Id.* at 104. At her deposition, Garrison was presented with that form and asked whether it would be "accurate" to state that "there are no questions in this paperwork … that ask you any questions for family medical history or any other genetic information." *Id.* at 104–05. Garrison responded: "I don't see anything on this paperwork, no." *Id.* at 105; *see also id.* ("Not on this paperwork it did not. I don't see anything on this paperwork, no …. No, I don't see it, anything on here, no.").

During the pre-test interview, a Datafit employee asked Garrison about her ability to complete certain physical tasks. *Id.* at 109. The employee then "asked [Garrison] about [her] heart," about whether she had "any problem with any heart disease or heart conditions or anything like that," and whether "there [are] any family members with any of these problems, heart disease or high blood pressure or things

of that nature." *Id.* at 109–10. Garrison told the Datafit employee that she "wasn't sure" about her family history. *Id.* at 111. The employee, perhaps detecting Garrison's emotional devastation, repeatedly pressed Garrison with questions regarding her ability to proceed with the physical test. *Id.* at 117, 120.

This pre-physical-test interview was the only time Garrison was asked for her family medical history or genetic information. *Id.* at 108–09.

## II. United's Motion to Exclude Ludgin's Testimony

### A. Legal Standards

The admission of expert testimony is governed by Rule 702 and the principles outlined in *Daubert*, 509 U.S. at 579. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 provides that expert testimony is admissible if the proponent demonstrates that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court performs a gatekeeping function, preliminarily assessing expert testimony to ensure it is reliable and relevant, in compliance with Rule 702. *Daubert*, 509 U.S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). When reviewing an expert opinion for reliability, the Court assesses "whether the reasoning

or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. As to relevancy, the Court considers whether the expert's "reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593.

### B. Analysis

### A. United's *Daubert* Motion Is Not Premature.

Garrison argues that United's *Daubert* motion is premature. [109] at 1, n.1. "[W]hen an expert's report or testimony is critical to class certification … a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *Am. Honda Motor Co., Inc. v. Allen,* 600 F.3d 813, 815–16 (7th Cir. 2010). In other words, "the district court must perform a full *Daubert* analysis before certifying the class if the situation warrants." *Id.*

In her class certification motion, Garrison claims that "*the* major common question in this case" is whether the consent form "solicits information protected under GIPA." [84] at 15 (emphasis added). She adds: "Proving this is a necessary element of the Putative Class Members' claims." *Id.* Garrison continues: "*To this end*, Plaintiff has retained an expert, Dr. Richard Ludgin, who will testify that [the consent form] targets the identification of information that Plaintiff … argue[s] constitutes genetic information under GIPA's broad definitions for same." *Id.* (emphasis added). By identifying the question of how the consent form should be read as the "chief" issue relevant to Rule 23's commonality analysis, and Ludgin's

5

testimony as critical to answering that question, Garrison has placed Ludgin's testimony at the heart of her class certification motion. *Id.* Indeed, Garrison's own description of the centrality of Ludgin's testimony in her motion for class certification severely undermines her later protest, when opposing United's *Daubert* challenge, that she "does *not* rely on Dr. Ludgin's testimony in support of class certification in any way, and his opinions are not necessary to the Court's Rule 23 determinations." [109] at 1, n.1 (emphasis in original).

The Court therefore proceeds to resolve United's *Daubert* challenge.

### B. Ludgin's Opinion Is Not the Product of Reliable Principles and Methods.

United argues that Ludgin does not base his opinion on any reliable principle or method. [100] at 11. Garrison retorts that Ludgin's "experience-based approach is not only permissible under Rule 702" but "is the exact type of professional reasoning the law identifies as reliable." [109] at 8. Based on the facts presented, the Court agrees with United.

"[M]ere expertise and subjective understanding are not reliable scientific evidence." *Brown v. Burlington N. Santa Fe Ry. Co.,* 765 F.3d 765, 776 (7th Cir. 2014). To be admissible, expert testimony may not rest only on the expert's conclusion: It must rest on a conclusion *supported by analysis. See Echo, Inc. v. Timerland Mach. & Irr., Inc.,* 661 F.3d 959, 965 (7th Cir. 2011). An expert espouses inadmissible *ipse dixit* where he fails to connect the dots between the data—or in this case, his experience—and the conclusion he reaches. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) ("The critical inquiry is whether there is a

6

connection between the data employed and the opinion offered; it is the opinion connected to existing data only by the *ipse dixit* of the expert that is properly excluded under Rule 702.") (cleaned up); *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 837 (7th Cir. 2015).

Ludgin's opinion focuses on the following language from the consent form: "I understand that I must notify the technician administering the assessment if I have any ailments that may impede my performance of the assessment." [100-2] ¶ 8. In a written declaration, Ludgin asserts that this language on the consent form "reasonably and implicitly required" "family history of certain conditions" because these conditions "may constitute inherited bodily disorders which could impede the prospective employee's performance of the assessment." *Id.* ¶ 10. He also asserts— and here (with the exception of the bracketed language) the Court quotes the relevant language from Ludgin's report verbatim: "To a reasonable person, [the consent forms] implicitly require the disclosure of personal ailments is necessarily a request to disclose manifestations of inheritable diseases or disorders in immediate family members or genetic information (i.e. family medical history)." *Id.* ¶ 11. In his three-page, 13-paragraph declaration, Ludgin writes nothing else that sheds any light on how he reached these conclusions.

Then, during his deposition, Ludgin tried to flesh out his analysis. He testified that a job applicant could be inclined to provide more information than what the employer had requested because "people who are looking to get hired are very solicitous, especially when they want the job … they're usually pretty forthcoming …

more broadly than what is asked or what's required, and maybe even into the realm of what's prohibited to be requested." [100-5] at 90–93; *see also id.* at 92 (testifying that "a young woman out of law school" applying for a job at a law firm would "volunteer[]" information about when she hoped to become pregnant because "she gets lulled into a sense of … relating to you, talking broadly"). Ludgin also testified that "patients construe words like this"—meaning "ailment"—"much more broadly and don't use it as precisely as medical practitioners do." *Id.* at 122; *see also id.* at 123 (testifying that it would be "a rare event" for a nurse or a physician to apply for the ramp attendant position). He explained that his "implicit understanding about when you ask patients questions, how they answer them" comes from his 20 years in health care, where he "helped design forms for research and take forms for research, consent forms for research, hospital consent forms, consent forms for procedures." *Id.* at 121.

Ludgin further explained that, in his work as an expert for this case, he did not "run any tests on how people respond when they're asked this question," compare the consent form in this matter to similar forms used by other employers, or review any studies "about how a person interprets medical forms." *Id.* at 120–21. Instead, Ludgin testified that his methodology boiled down to: "Just common sense. Just in general what the word means." *Id.* at 118–19.

Based on its review of Ludgin's written declaration and deposition testimony, the Court understands Ludgin to have reached the following conclusion: Because a "family history of certain conditions" may constitute an ailment that could impede an applicant's performance of the physical assessment, [100-2] ¶ 10, and because the

consent form requires the disclosure of such an ailment, a reasonable person would understand the consent form to implicitly require the disclosure of family medical history, *id.* ¶ 11. For purposes of Rule 702, though, Ludgin does not sufficiently explain how this conclusion is the product of reliable principles and methods. In the abstract, the Court does not take issue with Garrison's point that "experience-based analysis" may satisfy Rule 702's reliability requirement. [109] at 9. The problem is that Ludgin has failed to do so here.

First, Rule 702's reliability requirement is not satisfied by Ludgin's testimony that job applicants tend to be overly solicitous and to provide more information than what an employer has requested. [100-5] at 90–93. Therefore, his argument seems to go, even if the plain language of the consent form is read as only seeking information about ailments that currently and personally affect the job applicant, the applicant still would offer up additional, unsolicited information, up to and including her family medical history. However, nothing in Ludgin's professional experience suggests that he is an expert in human resources, hiring processes, or the psychology of job applicants. At best, he testified that he has hired some unspecified number of people at unspecified times in the past. *E.g.*, *id.* at 62, 106. But even then, he has not connected the dots between this vague and potentially meager professional experience and his testimony that job applicants tend to be more forthcoming than employers require. As a result, Ludgin's testimony to that effect does not support his opinion regarding what information United's consent form sought.

The same is true for other support Ludgin proffered for his opinion: that, in his professional experience working in the healthcare industry, patients filling out consent forms construe "words like" "ailment" "much more broadly" and less "precisely" than medical practitioners. [100-5] at 121–23. This phenomenon of imprecision may be true of patients receiving medical care—where Ludgin's professional experience lies. Again, however, Ludgin does not connect the dots to the instant case: How does the perspective of a patient reviewing a consent form—before a medical procedure, or while hospitalized, or when participating in medical research—correspond with the perspective of a "reasonable person" filling out this job application? Does a patient receiving medical care share the same interests as a job applicant performing a physical test? What in Ludgin's experience would lead him to conclude that those two populations are so alike such that his experiences with one group would be interchangeable with the other?[1] Ludgin does not say.

That leaves Ludgin's testimony that his understanding of the word "ailment" to include family history is the "common sense" meaning of the word, or "just in general what the word means." *Id.* at 119. But Rule 702(a) "permits only *helpful* expert testimony," and "[e]xpert testimony is not helpful if the jury, using logic or common sense derived from everyday experiences, does not need an expert to understand the evidence and arguments presented." *United States v. Curtain,* 142 F.4th 503, 509 (7th Cir. 2025). Ludgin does not point to anything in his professional

---

[1] This point is also contradictory to Ludgin's next one. Either it is "common sense" and "just in general what the word means" to construe "ailment" as including family health history, *or* a patient with no medical background would misunderstand the word "ailment" so broadly and imprecisely as to include family health history. Both cannot be true.

experience that led him to the conclusion that the "common sense" or "just in general" meaning of "ailment" includes family health history. A jury is perfectly capable of assessing the "common sense" or "general" meaning of the word "ailment" themselves, without Ludgin's input. His opinion is therefore unhelpful and inadmissible. *United States v. Christian*, 673 F.3d 702, 710 (7th Cir. 2012) ("A witness should not be allowed to put an 'expert gloss' on a conclusion that the [factfinders] should draw themselves. Expert testimony does not assist where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic.") (cleaned up).

Therefore, Ludgin has not shown "how his experience or expertise led to his conclusions." *Varlen Corp. v. Liberty Mutual Ins. Co.,* 924 F.3d 456, 459 (7th Cir. 2019). Ludgin has not connected his decades in healthcare administration to the question at hand: How a reasonable person, filling out the consent form pursuant to their United job application, would understand the statement: "I understand that I must notify the technician administering the assessment if I have any ailments that may impede my performance of the assessment." [100-2] ¶ 8.

Garrison argues that "Ludgin's analysis of the Consent Form reflects the same 'intellectual rigor' that he applied in his professional roles, where he routinely evaluated whether medical questionnaires and disclosure forms were properly drafted and whether the language used would be reasonably understood by patients." [109] at 8. But to support this point, Garrison cites only the portion of Ludgin's testimony where he speaks to his "implicit understanding about when you ask

11

patients questions, how they answer them"—with no further connection to the facts of this case or consent forms designed for job applicants rather than for medical procedures and research studies. [100-5] at 121.

Garrison also points to *Cage v. City of Chicago,* 979 F. Supp. 2d 787, 804 (N.D. Ill. 2013), as supportive of her point that "an expert who relie[s] primarily on decades of professional experience interpreting terminology employ[s] a reliable methodology under Rule 702." [109] at 7. *Cage* considered a serologist's definition of the word "extracts," as based on "his experience in the field of forensic serology and in part on the American Society of Crime Laboratory Directors Laboratory's … Accreditation Criteria Standards." 979 F. Supp. 2d at 802. *Cage* allowed the testimony, as "an expert witness may opine on the accepted meaning … of a word or phrase within a particular industry based on his or her experience and training" and "may rely on their professional experience to offer opinion testimony regarding the standard of care and generally–accepted industry standards." *Id.* at 803–04. But unlike the expert in *Cage,* Ludgin does not wield his experience as a hospital administrator to define any industry-specific terms. Rather, he testifies to the "common sense" or "general" meaning of a commonly used term. *See* [100-5] at 119.

For these reasons, Ludgin's testimony is not the product of reliable principles and methods, and is therefore inadmissible. United's motion to exclude Ludgin's testimony is granted. [99].

12

### III.   Garrison's Class Certification Motion

#### A. Legal Standards

Class certification is governed by Federal Rule of Civil Procedure 23. Before certifying a class, the Court must "make whatever factual ... inquiries are necessary" under it. *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir. 2001). Nevertheless, class-certification proceedings are not a "dress rehearsal for the trial on the merits," and the Court can only evaluate evidence to decide whether certification is proper. *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012).

A party seeking class certification "bears the burden of demonstrating that certification is proper by a preponderance of the evidence." *Bell v. PNC Bank, Nat'l Ass'n,* 800 F.3d 360, 373 (7th Cir. 2015). Failure to satisfy any of the requirements under Rule 23(a) precludes class certification. *Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 703 (7th Cir. 1993); *see also Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015). Of those four explicit requirements, the Court analyzes the third and fourth: whether Garrison's claims or defenses are typical of the claims or defenses of the class (typicality); and whether Garrison will fairly and adequately protect the interests of the class (adequacy of representation). *See* Fed. R. Civ. P. 23(a)(3), (4).

To satisfy Rule 23(a)'s typicality requirement, "there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the

13

group." *Spano v. Boeing Co.,* 633 F.3d 574, 586 (7th Cir. 2011). Typicality is satisfied if the named representative's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members," and the claims are "based on the same legal theory." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006). "Some factual variations may not defeat typicality." *Id.* Still, "the [typicality] requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Id.* "A person whose claim is idiosyncratic or possibly unique is an unsuitable class representative." *See Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 758 (7th Cir. 2014).

The adequacy inquiry under Rule 23(a)(4) "consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). United has not challenged the adequacy of class counsel, but it does challenge Garrison's adequacy.

A named plaintiff who is "likely to devote too much attention to rebutting an individual defense may not be an adequate class representative." *Stampley v. Altom Transp., Inc.,* 958 F.3d 580, 585 (7th Cir. 2020) (internal quotations omitted); *see also Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.,* 245 F. Supp. 3d 1007, 1021 (N.D. Ill. 2017) ("[A] plaintiff can't be an adequate representative of the class if the plaintiff is subject to a defense that couldn't be sustained against other class members."). "The fear is that the named plaintiff will become distracted by the

14

presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *CE Designs Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721, 726 (7th Cir. 2011). Therefore, "named plaintiffs who are subject to a defense that would not defeat unnamed class members are not adequate class representatives." *Randall v. Rolls-Royce Corp.,* 637 F.3d 818, 824 (7th Cir. 2011) (upholding the denial of class certification where the named plaintiffs' claims were "significantly weaker than those of some (perhaps many) other class members").

Not all quibbles with a named plaintiff's claims can derail her adequacy as class representative. "[T]rivial credibility problems or insubstantial defenses unique to the class representative," along with "petty issues manufactured by defendants" do not detract from the class's interests. *CE Design Ltd.,* 637 F.3d at 728. Yet a defense does not need to be watertight to defeat a proposed class representative's adequacy. It must be "arguable," *id.* at 726, and the challenge to adequacy must be "serious," *id.* at 728.[2] The question is whether admissible evidence so severely undermines the named plaintiff's claims that a fact finder might reasonably focus on that evidence, to the detriment of the rest of the class members' claims. *Id.*

---

[2] Relying on *Beaton v. SpeedyPC Software,* Garrison argues that a defense must be both arguable *and* "substantial" to defeat adequacy. 907 F.3d 1018, 1027 (7th Cir. 2018) ("A representative might be inadequate if he is subject to a substantial defense unique to him."). Regardless of the precise formulation required by the Seventh Circuit, for reasons the Court provides further on, the potential defense against Garrison's claims is both arguable and substantial; it is not petty. *See also Al Haj v. Pfizer Inc.*, 347 F.R.D. 212, 215 (N.D. Ill. 2020) (where the Seventh Circuit has articulated the relevant principle "in slightly different terms" on different occasions, choosing to "examine whether [plaintiff] is subject not just to any arguable defense, but to an arguable defense that is substantial").

15

### B. Garrison Does Not Satisfy the Typicality Requirement.

As recounted earlier, in moving for class certification, Garrison claims that "*the major common question in this case*" is whether the consent form "solicits information protected under GIPA," and that "[p]roving this is a necessary element of the Putative Class Members' claims." [84] at 15 (emphasis added). Because Garrison expressly disavowed this central premise in her sworn deposition testimony, her claim fundamentally deviates from the putative class's claims.

In her deposition, Garrison agreed that the consent form did not ask her "any questions for family medical history or any other genetic information," did not ask her "for any other kind of genetic information," and "did not ask … for family medical history." [100-4] at 104–05. Instead, Garrison articulated a theory of the case entirely divorced from the consent form: She claimed that a Datafit employee orally asked her about family health history. She testified:

> Then someone sat down with us and asked us, you know, a series of questions, explained the test to us and stuff like that.
>
> That was … when I was asked a series of questions about my health, you know, about my ability to be able to perform … the test that I was about to take. And I was also asked about my family's health, so. I was also asked -- the different types of questions they asked me, they also asked me was anybody in my family, you know, had the same types of medical conditions or anything like that, so.

*Id.* at 108. Shortly after she provided this answer, Garrison confirmed that "the only time" she was "asked for family medical history was this initial interview" before the physical test. *Id.* at 108–09. Garrison did not seek clarification from United's counsel

during the pertinent colloquy. And at the end of the deposition, Garrison's counsel elected not to ask Garrison any questions about her testimony. *Id.* at 122.

Garrison now attaches a short declaration to her reply brief. In it, Garrison asserts that during her deposition, she understood United's attorney to have been "narrowly" asking whether the consent form included "questions"—meaning, literally, "sentences ending in question marks"—about her family medical history. [108-1] ¶ 2. Because the consent form "does not contain any questions or question marks at all," Garrison maintains that her "testimony was accurate." *Id.* Garrison goes on to assert that she "was not asked during [her] deposition, and [she] did not testify, that the Consent Form did not otherwise create an obligation which required the disclosure of my genetic or family medical information." *Id.* ¶ 3. In the same vein, she writes that she "was also not asked whether the declaratory statements on the form—such as statements requiring disclosure of 'any ailments' that 'may impede performance'—could require the disclosure of [her] family medical history." *Id.* Ultimately, the point of Garrison's declaration seems to be that her deposition testimony does not foreclose her from now taking a position consistent with the putative class's claim. Still, in her declaration, Garrison never asserts that she, in fact, understood the consent form to require disclosures of her family medical history.

Garrison's declaration does not cure the problem created by her deposition testimony. "A court is well within its discretion to strike an affidavit that contradicts deposition testimony unless the affiant has offered a plausible explanation for the discrepancy." *Donaldson v. Johnson & Johnson,* 37 F.4th 400, 406 (7th Cir. 2022).

17

*Donaldson*, in turn, relies on *Russell v. Acme-Evans Company*, which states: "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." 51 F.3d 64, 67–68 (7th Cir. 1995).

The Court is not persuaded by Garrison's argument that her answers at the deposition were so "limited and benign" that they allow room for a claim that the consent form solicited family health information. [108] at 5. For the following reasons, the Court instead finds that Garrison's deposition testimony and declaration conflict, and it does not credit the latter over the former.

First, United's counsel asked Garrison several times whether the consent form asked for her family health history. Each time, Garrison denied that it did. Instead, she testified that a Datafit employee orally asked for her family health history and that this was the only time United sought this information. There is no suggestion in the deposition that the consent form is the crux of Garrison's claim. There was no mistake. Nor does Garrison point to any lapse in memory that would warrant crediting her belated declaration over her deposition.

Second, the Court does not credit Garrison's unduly narrow construction of the questions posed by United's counsel. [108-1] ¶ 2. Garrison argues that her testimony still fits with the putative class's theory of the case because—even though the consent form does not contain any question marks and therefore does not "ask" for or

18

"question" her about her family health history—the consent form still *solicits* (or "tends to elicit") that information. [108] at 5–6. But this argument slices Garrison's testimony too thin. She clearly conveyed a belief that she was injured not by the consent form, but by the Datafit employee. [100-4] at 108–09. That Garrison was not specifically asked whether the consent form violated GIPA (a legal question), or "solicited" or "elicited" her family health information (a matter of semantics) does not change the clear meaning of her testimony.[3]

Third, Garrison herself has previously used the word "question" in a manner that would encompass her purportedly distinct understanding of the words "solicit" or "elicit." In her amended complaint, Garrison alleged that "[d]uring the examination, Defendants required [her] to answer *questions* concerning her family medical history"; that "[s]uch *questions* included whether Plaintiff Garrison's family members had a history of cancer, heart disease, and other medical conditions"; and that "[b]y requiring Plaintiff Garrison to answer *questions* about her family medical history, Defendants directly or indirectly solicited, requested, purchased and/or required Plaintiff to disclose her genetic information in violation of GIPA." [17] ¶¶ 43, 48 (emphases added). Likewise, in her deposition, Garrison used the word "question" to describe a claim ostensibly based on the consent form's solicitation or elicitation of

---

[3] On the matter of semantics: The definition of "ask" and "solicit" are not so different that counsel's use of one word over the other in the deposition should meaningfully change a witness's testimony. The two verbs are virtually synonymous. *Compare Ask,* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ask ("to seek information") *with Solicit,* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/solicit ("to try to obtain (something) by usually urgent requests or pleas").

information. When asked what she believed "United did wrong," Garrison explained: "What I believe that they did wrong was *question* me about my family's medical history … Well, in *questioning* me about my family's genetic history, it may be using that information to determine whether or not … I'm capable of performing the job duties." [100-4] at 18–19 (emphasis added). Yet, via her declaration, Garrison now claims that the consent form presented her with no "questions" at all. *See generally* [108-1]. Garrison's shifting understandings of the meaning of "question" undermine her declaration.

Again, a court is well within its discretion to strike an affidavit that contradicts deposition testimony unless the affiant has offered a plausible explanation for the discrepancy. *Donaldson,* 37 F.4th at 406. Garrison has offered no plausible explanation here, so the Court sets Garrison's declaration aside.

That leaves two distinct claims: (1) Garrison's contention that United violated GIPA when a Datafit employee orally asked for her family health history, and (2) the putative class members' claim that United violated GIPA when it presented them with a consent form that implicitly solicited their family health histories. *See* [108] at 8 ("Plaintiff simply has not asked for class certification related to verbal questions she received or verbal answers she gave."). These claims arise from different events or courses of conduct. *See Oshana,* 472 F.3d at 514. And the alleged injuries are sufficiently distinct. *Uhl v. Thoroughbred Tech. and Tel., Inc.,* 309 F.3d 978, 985 (7th Cir. 2002) (a class representative must "suffer the same injury as the class members"). Certainly, there is insufficient "congruence" that would "justify allowing

20

[Garrison] to litigate on behalf of the group." *Spano,* 633 F.3d at 586. Rule 23's typicality requirement is therefore not satisfied.

Lastly, the Court addresses Garrison's argument that her testimony is immaterial to the question of whether the consent form seeks "information about an individual's current health status in a way that is likely to result in a covered entity obtaining genetic information." [108] at 6–7 (quoting 29 C.F.R. § 1635.8(a)). She again argues that the statement "I understand that I must notify the technician administering the assessment if I have any ailments that may impede my performance of the assessment" is objectively "likely to result in United obtaining genetic information," especially where the consent form "is provided in the context of a physical exam." *Id.* at 6. She urges the Court to apply an "objective" standard to this statement "that focuses on the [consent] form itself." *Id.* at 7. Even if the Court were to acquiesce to Garrison's urging and apply an "objective" standard to the consent form, then the Court also would have to accept the premise that Garrison's claim arises from the consent form. But Garrison expressly disclaimed this premise when she testified that United solicited her genetic information not through the form, but orally, through a Datafit employee. *See* [100-4] at 104–05.

Perhaps Garrison might argue that this is where Ludgin would step in and save the day by testifying that—Garrison's testimony aside—the consent form *did* solicit genetic information because any reasonable applicant would understand the form to be seeking disclosure of family medical history. But the Court has excluded

21

Ludgin's testimony, so Garrison's testimony that the form did *not* ask for family health history is left to stand on its own.

All in all, Garrison and the putative class members' claims do not share "the same essential characteristics," *see Oshana*, 472 F.3d at 514, meaning that Garrison has failed to satisfy Rule 23(a)'s typicality requirement. Her class certification motion fails on this ground alone.

### C. Garrison Does Not Satisfy the Adequacy Requirement.

Garrison's failure to establish adequacy provides an additional, independent ground for denying her motion for class certification. Garrison's state of mind at the time of the physical test exposes her claim to arguable and substantial litigation challenges that render her an inadequate class representative.

To recap, as she was waiting to begin her test, Garrison received a call from a family member telling her that her brother had died of heart failure. [100-4] at 21–22. Understandably, this news caused Garrison to feel "very broken up emotionally." *Id.* at 120–21. Immediately after hearing this news, Garrison continued with the pre-physical test interview. *Id.* at 108–09. She suspected that her distress was visually obvious, "like [she] probably wouldn't be able to perform the test because of what [her] condition may have been at the time of hearing of bad news." *Id.* at 117, 120–21. Garrison also suspected that her emotional appearance caused the Datafit employee to "ke[e]p[] asking" whether she was sure she would be able to complete the physical test. *Id.* at 120–21. It was during this time—directly after hearing of her brother's death, as she was about to begin the physical test, and as the Datafit employee

22

questioned her ability to complete the test—that the Datafit employee asked Garrison about her family medical history. *Id.* at 108–09.

Garrison's emotional state at the time of her interview naturally would be a substantial focus of the litigation. United would almost certainly ask Garrison how her emotional state contributed to her demeanor during the pre-test interview, the Datafit employee's concern as to her ability to complete the test, and the questions posed to her by the Datafit employee. The Datafit employee similarly would be asked whether Garrison's emotional state lead her to ask, perhaps inadvertently, questions that she otherwise would not have asked another job applicant. *See* 410 ILCS 513/25(g) ("[I]nadvertently requesting family medical history by an employer … does not violate this Act.").These questions would provide fodder for impeachment and constitute individualized lines of attack on Garrison. And they would be fair questions to ask; they would not be trivial or petty. *See CE Design Ltd.,* 637 F.3d at 728.

These obstacles to a potential finding of liability would not apply to other class members. And were Garrison unable to surmount them, "she would sink each absent member's claims even though they might have prevailed had a class representative without [Garrison's] baggage been carrying the torch." *Lipton v. Chatthem, Inc.,* 289 F.R.D. 456, 460 (N.D. Ill. 2013). Garrison is therefore not a proper class representative. *Westmoreland v. Hughes,* 144 F.4th 952, 956 (7th Cir. 2025) ("Where it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff, then the named plaintiff is not a proper class

23

representative.") (cleaned up). This is not to say that United's arguments against Garrison's claims are sure winners—but the challenges are both arguable and substantial. That is all that is needed to show Garrison's inadequacy. *See CE Design Ltd.,* 637 F.3d at 728; *Beaton,* 907 F.3d at 1028; *see also supra* at n. 2.

Garrison's inadequacy serves as a second and independent basis to deny her class certification motion. The Court need not reach the rest of United's Rule 23 arguments.

## IV. Conclusion

For the reasons stated above, the Court grants United's motion to exclude Ludgin's opinions [99] and denies Garrison's class certification motion [83], [84]. By April 10, 2026, the parties are directed to submit a joint status report proposing next steps in these proceedings, including whether settlement is a possibility and whether the parties request a referral to the assigned Magistrate Judge for purposes of conducting a settlement conference. The Court sets a status hearing for April 16, 2026, at 9:30 a.m.

ENTER:

_____
Georgia N. Alexakis
United States District Judge

Date: March 30, 2026

24